UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------------X

JOHN DOE,                                 :      Civ. Action No.:
                                          :
              Plaintiff,                   :
                                          :      **COMPLAINT**
       -against-                          :
                                          :
UNIVERSITY OF MASSACHUSETTS               :      **JURY TRIAL**
AMHERST,                                  :      **DEMANDED**
                                          :
              Defendant.                   :
------------------------------------------------------------X

Plaintiff John Doe[1], ("John Doe"), by his attorneys Nesenoff & Miltenberg,

LLP, as and for his Complaint, respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.      This case arises out of the actions, inactions, omissions, and the flawed

procedures employed by Defendant University of Massachusetts Amherst

("Defendant UMass") concerning the wrongful allegations of sexual misconduct

made against Plaintiff, by fellow UMass student, Jane Doe.  Plaintiff and Jane Doe

met through mutual friends at a social gathering on the evening of September 13,

2013 ("Evening of September 13").  Following four hours of back-and-forth

flirtation, Jane Doe text messaged her roommate to reserve her room to be alone

with Plaintiff.  The two became intimate and eventually engaged in sexual

intercourse in Jane Doe's dormitory room.  Prior to each act leading up to and

---

[1] Plaintiff has filed, contemporaneously with this Complaint, a Motion to proceed pseudonymously.

including sexual intercourse, Plaintiff asked for Jane Doe's consent and, each time, Jane Doe responded clearly and verbally with "Yes."   Once back in his room, Plaintiff grew worried that perhaps they were not as careful as they should have been and reached out to Jane Doe to suggest that she consider taking "Plan B," the morning after pill.

2.     With his romantic interest piqued, Plaintiff reached out to Jane Doe hours later (on September 14) via text message.  However, Jane Doe was slow to respond and when she did respond, her messages were distant.   Plaintiff was crushed to realize that their evening of consensual sex the prior night was merely a one-night-stand for Jane Doe.

3.     Unbeknownst to Plaintiff, Jane Doe claimed not to recall what happened when discussing the Evening of September 13 with her friends the following day.   At their urging, Jane Doe decided to report the Evening of September 13 to UMass administrators.

4.     Although no police report was ever filed, and Jane Doe's complaint never classified the Evening of September 13 as "non-consensual," "rape," or "assault," UMass charged Plaintiff with four (4) violations of the Code of Student Conduct, namely, (i) Threatening Behavior; (ii) Sexual Harassment; (iii) Sexual Misconduct; and (iv) Community Living Standards, banned him from campus

2

(except for classes) and immediately pronounced him a "threat" and required him to vacate his dormitory. Ultimately, Defendant UMass found Plaintiff responsible for three charges: sexual misconduct, sexual harassment and community living standards violations, and expelled him from UMass.

5.  When Defendant UMass found Plaintiff guilty of sexual misconduct, Plaintiff was deprived of the most basic due process and equal protection rights and was discriminated against on the basis of his male sex. UMass failed to conduct a material investigation into Jane Doe's allegations. Plaintiff was not advised of all resources available to him on campus; he was denied the effective assistance of any advisor; he was denied medical care at University Health Services; he had to resort to Freedom of Information Act requests to obtain relevant information that was not readily provided to him by UMass; cross-examination of his accuser was effectively denied; Plaintiff and his hearing witness were hampered from providing essential explanations and evidence of the Evening of September 13; and Plaintiff was met with overall hostility, dismissal and pre-judgment as "guilty" before the Decision was even rendered. The Hearing Board's treatment of Plaintiff during the Hearing, especially by the chairperson, Dennis Conway, reflected the lack of impartiality and pre-judgment against an accused male student.

6.    Defendant UMass failed to adhere to its own guidelines and regulations, and the guidelines and regulations themselves are insufficient to enable a student to have a fair hearing before an impartial tribunal. The decision reached was discriminatory, presumptive and/or arbitrary and capricious; given the lack of substantive evidence of Jane Doe's intoxication or lack of consent, a presumptive and/or discriminatory bias against males was required for a conclusion of sexual misconduct to be reached and expulsion ordered.

7.    Plaintiff has been greatly damaged by the expulsion: Plaintiff's educational career and his academic future have been severely damaged; the monies spent on obtaining a college education at Defendant UMass squandered; and his psychological, emotional, and physical health have been greatly compromised by the entire ordeal. Thus, Plaintiff brings this action to obtain relief based on causes of action for, among other things, violations of Title IX of the Education Amendments of 1972 and state law.

## THE PARTIES

8.    Plaintiff John Doe, ("Plaintiff" or "John Doe"), is a natural person residing in Bristol, Connecticut. During the events described herein, Plaintiff was a student at UMass and resided on the UMass campus in Amherst, Massachusetts.

9.   Upon information and belief, Defendant University of Massachusetts Amherst ("Defendant UMass" or "UMass") is a nationally-ranked public research university located in Amherst, Massachusetts. Upon information and belief, 25% of UMass funding is derived from Massachusetts state funds.

10.   Plaintiff and Defendant UMass are sometimes hereinafter collectively referred to as the "Parties."

## JURISDICTION AND VENUE

11.   This Court has diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1332 because: (i) Plaintiff and Defendant UMass are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

12.   This Court has personal jurisdiction over Defendant UMass on the grounds that Defendant UMass is conducting business within the State of Massachusetts.

13.   Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**I. Agreements, Representations, Covenants &
Warranties Between Plaintiff and Defendant UMass**

14.     Plaintiff is a Connecticut native who worked diligently in high school to prepare for his eventual entry into college.  In addition to achieving a high grade point average and competitive SAT scores, Plaintiff also obtained four (4) advanced placement credits, performed volunteer work, and played varsity track and field.

15.     Setting his sights on a competitive, top quality education, Plaintiff applied to UMass and was accepted to the class of 2016.

16.     Upon his acceptance, Defendant UMass provided Plaintiff with copies of its school policies, including the Code of Student Conduct 2012/2013 (the "Code").

17.     The Code states in relevant part:

> Because the functions of a university depend on **honesty, integrity and civility among its members**, the University of Massachusetts, **expects a higher standard of conduct than the minimum** required to avoid disciplinary action.

> While many of the University's standards of conduct parallel the laws of society in general, **university standards also may be set higher and more stringently than those found elsewhere in society**.

<u>See</u> Code of Student Conduct, Section I (C), p. 2 (emphasis added).

6

18.    UMass addresses the impact of voluntary consumption of drugs and alcohol on a student's behavior *without any limitation on gender or party position, i.e. complainant vs. respondent*:

> Any behavior which may have been influenced by a student's mental state (irrespective of the ultimate evaluation), or voluntary use of drugs or alcoholic beverages **shall not  in any way limit the responsibility of the student for the consequences of his or her actions**.

See Code of Student Conduct, Section I (M), p. 3 (emphasis added).

19.    According to the Code, UMass ensures that all Hearing Board members attend "a training program that includes but is not limited to **specialized training in addressing sexual assault and bias related incidents**."  See Code of Student Conduct, Section III (A), p. 8 (emphasis added).  The standards set forth in the Code are not dissimilar from those set out by the U.S. Department of Education's Office for Civil Rights (OCR) "Dear Colleague Letter," dated April 4, 2011.

20.    The members of the Hearing Board must be impartial.  See Code of Student Conduct, Section IV (B), p. 10.

21.    UMass defines "Sexual Misconduct" as (a) engaging in a sexual act with another person: (i) without consent; (ii) by placing the other person in fear of harm; or (iii) by administering alcohol or drugs to the other person without that

7

person's knowledge; or (b) engaging in a sexual act with another person when: (i) the other person is incapable of understanding or is unaware of the sexual act by reason of intoxication; (ii) physically incapable of resisting or communicating consent; or (iii) the other person is under the age of 16. See Code of Student Conduct, Section II (B)(4), p. 5.

22.    UMass acknowledges that the Title IX Coordinator has a responsibility to coordinate the recipient's efforts to comply with its obligations under Title IX and the Title IX regulations. See Affirmative Action and Non-Discrimination Policy Statement, *available at* http://www.umass.edu/eod/aapolicy.html (last visited July 28, 2014). These responsibilities include coordinating any investigations of complaints received pursuant to Title IX and the implementing regulations. Id.

23.    In the Fall of 2012, Plaintiff traveled from Bristol, Connecticut to Amherst, Massachusetts to join the class of 2016 at UMass.

## II. The Evening Of September 13

24.    On or about September 13, 2013, at around 10:00 p.m. in the evening, Plaintiff attended a party at his friend's, Thimi Prifti, dormitory room on the 5th floor of Field Hall.

25.    When he arrived, Plaintiff noticed that there was alcohol at the party. Plaintiff did not know anyone other than Mr. Prifti at the party, however, he fixed

himself a drink and began to mingle.  One of the individuals in the room was Jane

Doe.  Soon, everyone began to play a card game called, "Kings," and Plaintiff

joined in the card game.

26.    At around midnight, everyone stopped playing card games and began

talking, dancing and listening to music.  Jane Doe approached Plaintiff and started

talking to him.  Plaintiff had not taken notice of whether or not Jane Doe had

consumed alcohol during the night, but at this point she was speaking clearly and

exhibited no signs of intoxication or incapacitation.  Plaintiff and Jane Doe

continued to talk for a long time, then Jane Doe asked Plaintiff for his cell phone

number.

27.    For the next few hours, Jane Doe and Plaintiff traded text messages

during the party and watched YouTube videos together, including the music video

for the song, "Blurred Lines," by Robin Thicke.  Both agreed that they enjoyed that

song very much.  All night long, Jane Doe was clearly interested in pursuing

Plaintiff and followed Plaintiff whenever he walked around during the party or

outside in the lounge area of Field Hall.

28.    At no point during the evening did Jane Doe appear intoxicated.  To

the contrary, at all times, Jane Doe appeared to be very comfortable with Plaintiff;

leaning towards him, making eye contact and smiling.  Jane Doe was fully

9

conscious and aware of her surroundings; she spoke to Plaintiff in a coherent and intelligible manner without slurring her speech, and walked from place to place with Plaintiff without stumbling. Furthermore, Jane Doe texted back and forth with Plaintiff throughout the evening about various subject matters, including comments about the song, "Blurred Lines". All the while, Jane Doe's text messages demonstrated correct spelling, grammar, and punctuation.

29.    Deciding that she wanted to be alone with Plaintiff to have sexual intercourse, at about 2:00 a.m., Plaintiff text messaged her roommate, Olivia Harrington, to reserve her room. When Ms. Harrington asked whether Jane Doe was sure about spending the night with someone she just met, Jane Doe responded, "it's all good," that she was "fine," and that she was not "drunk that much anymore." It should be noted that neither Mr. Pires, nor Ms. Harrington was present at the party held at Mr. Prifti's dorm room that night. Mr. Harrington did not check on Jane Doe or refuse to clear the room that evening.

30.    Jane Doe and Plaintiff began kissing in the lounge area of Field Hall. After about ten (10) minutes of kissing, Jane Doe invited Plaintiff to her room. Jane Doe told Plaintiff that it would be more private in her room than the lounge because her roommate was not there that night. At that point, Plaintiff stated that he did not have a condom on him, but suggested he could stop off at his dorm room to pick

10

one up.  Jane Doe replied, "good" and told Plaintiff to meet her at her room on the 6th floor of Field Hall and to bring the condom with him.

31.    Mr. Prifti spotted Plaintiff and Jane Doe leaving the lounge at around 2:30 a.m.  Plaintiff went to his room to get a condom and then went to Jane Doe's room and knocked on her door.  At no point during this time did Jane Doe text message or call Plaintiff to tell him she had changed her mind about having sexual intercourse that night.

32.    When Plaintiff arrived at Jane Doe's dorm room, Jane Doe greeted him at the door and welcomed him inside.  Jane Doe still appeared completely sober.

33.    Plaintiff and Jane Doe went to her bed and began kissing.  Plaintiff asked if she was a virgin and Jane Doe responded, "No" and that she had sex a few times before.

34.    Before each successive act, Plaintiff asked Jane Doe for permission first.  Before he removed her shirt, Plaintiff asked for Jane Doe's consent and she replied, "Yes."  After kissing for a while, Plaintiff asked if he could remove her bra, and again Jane Doe replied, "Yes" and proceeded to take her bra off herself.  Before he touched her breasts, Plaintiff asked for permission again, and, again, she replied, "Yes."  Plaintiff asked if she wanted to perform oral sex with him, to which she responded, "Yes" before she proceeded to straddle Plaintiff's legs and unbutton and

11

pull down his pants and underwear. She proceeded to perform oral sex on Plaintiff while he laid there on the bed caressing her hair. At no point did she indicate to Plaintiff, through her words or actions, that she wanted to stop performing oral sex.

35.   Next, Plaintiff asked if he could take off Jane Doe's pants and underwear, and she said "Yes." She proceeded to take her own pants and underwear off. After kissing a while longer, Plaintiff asked Jane Doe what she wanted him to do, to which she responded, "Please fuck me" and reminded Plaintiff to use a condom.

36.   Plaintiff and Jane Doe engaged in sexual intercourse for less than a minute before Plaintiff was no longer stimulated. Instead, Plaintiff and Jane Doe began to cuddle and kiss for a while until Plaintiff asked if Jane Doe wanted to perform oral sex on him again. Jane Doe responded, "Yes" and proceeded to perform oral sex on Plaintiff. Plaintiff then asked if she wanted him to perform oral sex on her and she stated, "Yes." It was about 4:40 a.m. when both Plaintiff and Jane Doe finished engaging in sexual activity and Plaintiff had climaxed onto Jane Doe. At that point, Jane Doe advised that her roommate might return soon and suggested that Plaintiff leave her room.

37.   Jane Doe indicated that she was going to take a shower and she stood up and put on her towel, grabbed her shower caddy, and put on her flip flops.

12

38.     Plaintiff began to put his clothes on and told her that he had fun that night and that it would be great to do it again.  Jane Doe agreed and then left the room and walked down the hall to the bathroom to shower.

39.     Once back in his room, Plaintiff grew worried that perhaps they were not as careful as they should have been and reached out over text message to Jane Doe to suggest that she consider taking "Plan B," the morning after pill.

40.     Plaintiff eventually drifted off to sleep at around 5:00 a.m. on September 14, 2013.

41.     When Plaintiff awoke later that morning, Plaintiff still had not received a response text message from Jane Doe.  Plaintiff reached out to Jane Doe via text message to touch base.  However, Jane Doe was slow to respond and when she did respond, her messages seemed as though she was less interested in continuing a relationship.  Plaintiff was crushed to realize that their evening of consensual sex the prior night was merely a one-night-stand for Jane Doe, because Plaintiff was hopeful that it would be the start of a dating relationship.

### III.   Defendant UMass's Mishandling Of Jane Doe's Complaint About The Evening of September 13

42.     On September 14, 2013, Jane Doe texted with her roommate, Olivia Harrington and friend, James Pires, about the prior evening with Plaintiff.

13

43.     Apparently, Jane Doe claimed that she could not recall the events of the Evening of September 13.  However, Jane Doe's friends coaxed and urged her to seek health services and to report the Evening of September 13 to UMass.  Jane Doe went to University Health Services and made a report with the Dean of Students Office on September 15, 2013.  Upon information and belief, no rape kit was ever performed, and UMass never asked whether one was performed.

44.     In her formal written complaint, Jane Doe never classifies the Evening of September 13 as, "harassment," "assault," or "rape."   Instead, she describes details of meeting Plaintiff that evening and stated that she "feel[s] bad writing this report because [she] [doesn't] know how to classify what happened to [her] that night."

45.     Notwithstanding Jane Doe's apparent confusion and/or equivocation, on September 18, 2013, UMass advised Plaintiff that he was being charged with four (4) violations of the Code, namely, "Threatening Behavior," "Sexual Harassment," "Sexual Misconduct" and "Community Living Standards" (collectively, the "Charges"), for his one night of consensual sex with Jane Doe on the Evening of September 13.

46.     Plaintiff was shocked when he learned that Jane Doe had filed a formal complaint with UMass regarding their one evening of consensual sexual activity,

14

coupled with the fact that he had seen Jane Doe happily playing Frisbee with friends on campus on September 14. His shock was compounded by the fact that he was still dealing with the emotional rejection from Jane Doe's lack of responses to his efforts to start a more serious relationship.

47.     Immediately, UMass pronounced John Doe a "threat" and banned him from all premises of the university except to attend classes, due to Jane Doe's false accusations. UMass issued a "no contact" order against Plaintiff with respect to Jane Doe. Plaintiff was given less than 8 hours' notice to gather a few of his belongings, find a place to stay, secure a means of transportation, and leave campus.

48.     Plaintiff was advised that he was entitled to access the on-campus Counseling & Psychological Services.

49.     Purportedly, UMass's Student Legal Services provides representation, document preparation, counseling, mediation, referral and advisors for disciplinary hearings legal advice for UMass students on a variety of matters, including, without limitation, Code of Student Conduct violations. However, Defendant UMass initially failed to advise Plaintiff of the availability of such services for the purpose of defending against his disciplinary hearing or his right to use such services.

50.     At no point did UMass ever advise Plaintiff that the Title IX Coordinator, Debora Ferreira, was an additional resource at his disposal. In fact,

15

Plaintiff later learned that UMass's own Title IX Coordinator had no knowledge of Plaintiff's student conduct case until <u>after</u> the case was already decided by the Hearing Board.

51.    Following his meeting about the Charges on September 18, Plaintiff sought to obtain health services on campus to have a physical examination and sexually transmitted disease testing performed.    Additionally, Plaintiff sought a referral for counseling for his extreme stress stemming from the Charges he was faced with.

52.    However, University Health Services refused to provide a physical examination or STD testing on the grounds that they had "never been in this situation" before and were "not equipped" to handle this.   Plaintiff was advised that he would be "better served" by going to the local hospital, Cooley Dickinson Hospital, in Northampton, Massachusetts instead.   As a result, Plaintiff was forced to incur the additional costs of an emergency room visit to perform such services, including the physical strain and inconvenience of driving an additional distance each way and waiting for hours in the emergency room before receiving medical attention.

53.    Upon information and belief, UMass failed to conduct any material investigation of the Charges; UMass failed to interview witnesses, and failed to

conduct any material investigation of Jane Doe's alleged intoxication on the Evening of September 13. In fact, upon information and belief, UMass failed to assign a specially trained Title IX investigator to conduct an investigation in this case. Any information-gathering was performed by several different UMass officials, who are not properly trained in sexual misconduct or the effects of alcohol. The entire process was disorganized and chaotic. Plaintiff was banned from campus during this entire time other than to attend class.

54.     During the time period that Plaintiff was banned from campus, he had to drive nearly two (2) hours each way to and from his home in Bristol, Connecticut to Amherst, Massachusetts to attend classes. The daily four (4) hour commute, combined with the added stress of the disciplinary process, negatively impacted Plaintiff's studies and health.

55.     In preparation of his defense, Plaintiff prepared a list of cross-examination questions for the Hearing Board to ask Jane Doe at the Hearing. However, he was required to submit the list of questions to Dean Patricia Cardoso first and, following her review, part of his list of questions was deleted by Dean Cardoso for no apparent reason, including, questions such as "How much did you drink?" and "Do you remember sending John Doe text messages?" Given the fact that Jane Doe admitted in text messages that she kicked out her roommate in order

17

to have the room to herself to engage in sexual activity with Plaintiff and that she was not drunk by the time she made the decision to have sex, Plaintiff's questions were proper and should not have been deleted. Dean Cardoso assured Plaintiff that the Hearing Board would ask "very in-depth questions" to Jane Doe and that Plaintiff "has nothing to worry about."

56. The Code states, "[b]oth the complainant and charged student are entitled to view and receive copies of all submitted witness statements prior to the hearing." Code of Student Conduct, Section IV (E), p. 10.

57. On or about September 26, 2013, UMass finally provided Plaintiff with a packet of documents for his review, which purportedly constituted the investigation file, including: statements by Plaintiff and by Jane Doe, text messages between Plaintiff and Jane Doe, notes from meetings with Plaintiff and Student Life and Conduct Coordinator Patrick Dowling and Assistant Dean of Students Kelly Gray, and emails from Plaintiff to UMass regarding the incident.

58. Believing (correctly) that there should be more documents relevant to the Charges, but not produced by UMass, Plaintiff made a request to UMass on October 31, 2013 to provide him with "any and all documents or information the University had or has received regarding this matter." In response, UMass provided the following additional documents *dated that same day, October 31, 2013*: email

statements by Olivia Harrington, Thimi Prifti and James Pires, and text messages between Jane Doe and Ms. Harrington.

59.     Notwithstanding UMass's two separate productions of documents in September and October, UMass still failed to provide Plaintiff with all relevant case documents to aid in Plaintiff's defense of the charges.

## IV.   The Disciplinary Hearing

60.     On November 5, 2013, UMass held a student conduct hearing regarding the allegations of sexual misconduct against Plaintiff ("Hearing").

61.     The student conduct hearing board consisted of three (3) members, which included one student, Ashley Prinz, and two faculty, DeVaughn King and Jessica Prodoehl ("Hearing Board").  The chairperson of the Hearing was Dennis Conway.

62.     As UMass failed to provide to Plaintiff all documents related to his student conduct case, the Hearing Board did not have before it several key pieces of information, including, but not limited to: (i) the Incident Report, if any, by the Resident Assistant, Mike Petrillo, who was on duty the Evening of September 13, 2013; (ii) the Incident Report, if any, by the Resident Director, Ben Kisang, who was on duty on the Evening of September 13, 2013; (iii) the report, if any, by Residence Education Leadership (REL), Ryan Young, (iv) the report, if any, by the

19

triage nurse who fielded Jane Doe's call; (v) the report, if any, from the Center for Women & Community staff who spoke to Jane Doe; and (vi) missing pages from emails between Dean Patricia Cardoso and Jane Doe's roommate Olivia Harrington and friend James Pires, which contained handwritten notes by Dean Cardoso.

63.    Throughout the Hearing, Mr. Conway's line of questioning, tone, demeanor and overall behavior demonstrated his presumptive bias against Plaintiff and/or failure to conduct a fair, equitable and objective opportunity for Plaintiff to be heard.    Mr. Conway constantly interrupted Plaintiff's testimony and the testimony of Plaintiff's witnesses, yet did not do the same for Jane Doe.    Mr. Conway posed questions to Plaintiff in a confusing manner and became belligerent when Plaintiff asked for clarification.

64.    In stark contrast, Mr. Conway was supportive of Jane Doe and addressed her in a calm, soothing and reassuring manner throughout the Hearing. Mr. Conway belittled Plaintiff's responses and became distracted whenever Plaintiff provided essential testimony.    Mr. Conway also prevented Plaintiff from explaining his submission of documentary evidence, "Typical Effects of BAC," regarding blood alcohol content to contradict Jane Doe's testimony and prove his point about Jane Doe's behavior on the Evening of September 13.    Mr. Conway's

20

accusatory behavior toward Plaintiff was highly prejudicial, in violation of the Code, and cast doubt as to the Hearing Board's overall impartiality.

65.     The Hearing Board did not engage in meaningful cross-examination of Jane Doe and did not allow Plaintiff to ask all of the UMass-approved questions he had prepared for her.  Plaintiff was not given any opportunity to question Jane Doe regarding the information that she provided at the Hearing.  The Hearing Board failed to question Jane Doe about her alleged use of anti-depressants, whether she took anti-depressants on the Evening of September 13, or its potential side effects when mixed with alcohol. Despite Dean Cardoso's assurances that the Hearing Board would ask "very in-depth questions" to Jane Doe and that Plaintiff "has nothing to worry about," the Hearing Board neglected to ask all of Plaintiff's questions; they did not even ask all of the questions approved by Dean Cardoso.

66.     Although it was confirmed that Ms. Harrington was not present at the party on the Evening of September 13, the Hearing Board did not question Ms. Harrington about the basis of her knowledge that Jane Doe was purportedly "too intoxicated" to consent to sexual intercourse with Plaintiff that night or why she vacated the room as Jane Doe directed and did not check on Jane Doe if she was, as purported, "too intoxicated."

67.    Plaintiff attempted to explain that he did not witness how much Jane Doe drank that evening and was completely unaware of Jane Doe's purported intoxication and/or incapacitation on the Evening of September 13.   However, the Hearing Board was dismissive of Plaintiff's testimony about Jane Doe's coherent speech, logical text messages, pre-planning to have the room vacated, and full control over her physical body movements on the Evening of September 13.

68.    The Hearing was three and one half (3 and 1/2) hours and ended by 5:00 p.m.

69.    The Hearing was recorded via audio tape.

## V. Plaintiff's Formal Complaint of Harassment Is Ignored And Jane Doe Escapes Scrutiny Of Her Own Actions

70.    On December 8, 2013, Plaintiff filed a formal complaint of harassment against Jane Doe to UMass pursuant to Section II (B)(2) of the Code, p. 5.

71.    However, by March 4, 2014, UMass had failed to contact the Plaintiff about his complaint.   The Plaintiff submitted requests to UMass to obtain the status of the complaint or the investigation conducted, if any, regarding the allegations of his complaint.   UMass failed to provide a response to the Plaintiff regarding the status of his December 8, 2013 harassment complaint.

72.    Plaintiff submitted a FOIA request on April 4, 2014 to UMass to request all documents, reports and outcomes regarding his harassment complaint

and copies of any emails sent or received by or among university staff/administrators regarding same.

73.     UMass responded in June 2014 advising the Plaintiff only of the cost to obtain the information, including fees for staff time to search documents and fees for photocopying the documents.

74.     Although Jane Doe admitted to consuming alcohol on the Evening of September 13, it should be noted that Jane Doe was never charged with a violation of UMass's alcohol policy for underage drinking, nor was her voluntary use of alcohol considered as an "aggravating" factor with respect to the allegations, notwithstanding UMass's clear policy that, "[a]ny behavior which may have been influenced by a student's mental state (irrespective of the ultimate evaluation), or voluntary use of drugs or alcoholic beverages shall not in any way limit the responsibility of the student for the consequences of his or her actions." See Code of Student Conduct, Section I (M), p. 3.

75.     Upon information and belief, UMass's preferential treatment of Jane Doe over Plaintiff is undeniably linked to her female gender and against Plaintiff's male gender.

## VI.   **Decision & Sanctions**

76.   On November 7, 2013, Plaintiff learned that the Hearing Board found him "Responsible" for three out of four charges, namely, "Sexual Harassment," "Sexual Misconduct" and "Community Living Standards" ("Decision").   In its Decision, UMass stated that Plaintiff should have known Jane Doe was intoxicated to the point of black out and unable to give consent.

77.   In the Decision, the Hearing Board determined that Ms. Harrington was more credible than Plaintiff and credited her testimony to corroborate Jane Doe's intoxication on the Evening of September 13.   However, the Decision fails to provide any detail about why the Hearing Board found Ms. Harrington more credible than Plaintiff, despite the fact that Ms. Harrington was not even present at the party on the Evening of September 13 to witness Jane Doe's behavior and demeanor, and was not in Jane Doe's room when Plaintiff and Jane Doe engaged in consensual sexual intercourse that evening.

78.   Another grounds for the Decision was that Plaintiff was "able to be more and less detailed when questioned about specific parts of the incident."   This stated ground was a blatant mischaracterization; Plaintiff was not allowed to provide full answers to Mr. Conway's arbitrary and confusing line of questioning

due to Mr. Conway's constant interruption of Plaintiff's testimony – any "lack of detail" was due to the Hearing Board's handling of the Hearing.  Meanwhile, Jane Doe was purportedly unable to recall whole segments of the evening, yet was able to conveniently recall drinking at the party, meeting Plaintiff, and taking a shower following the consensual sexual intercourse with Plaintiff. UMass allowed Jane Doe to be "more and less detailed when questioned about specific parts of the incident," without scrutiny and without penalty.

79.    Defendant UMass's decision was arbitrary and capricious given the lack of a full and complete record of evidence, failure to conduct a proper investigation and slanted hearing process.

80.    Concurrent with the Decision, UMass provided Plaintiff with a Student Conduct Hearing Board Report ("Report"), which provided a summary of the allegations and the evidence purportedly received by the Hearing Board at the Hearing.    In the Report, Plaintiff noticed several glaring errors and/or misstatements/mischaracterizations of the evidence presented to the Hearing Board.

81.    First, Jane Doe never stated that her hair was pulled on the Evening of September 13.  However, the Report described the event by stating that Jane Doe "remembered her hair being pulled."  The Report described the chronology of the events of the Evening of September 13 and stated that "things are getting blurry"

25

for Jane Doe.  However, such description was taken out of context and completely ignored the fact that Jane Doe and Plaintiff were texting that evening about the Robin Thicke's song, "Blurred Lines."  At no point did Jane Doe claim that "things were getting blurry" for her that evening.

82.   Inexplicably, UMass meted out the highest sanction of expulsion ("Sanction").

83.   Plaintiff was advised of his right to appeal the Decision within five (5) business days if Plaintiff could show a procedural error or irregularity which materially affected the decision, or new evidence not previously available, which would have materially affected the decision.

## VII.   Appeal of the Sanction

84.   Upon his receipt of the decision of his Hearing, Plaintiff learned that his sanction was expulsion.  Plaintiff immediately began to work on the appeal of the Decision.

85.   To prepare his Appeal, Plaintiff requested a copy of the audio recording of the Hearing pursuant to Code, Section III (D) (3).  To his surprise, there is a large portion of the recording that is missing, which corresponds to Ms. Harrington's hearing testimony - - the "star witness" that the Hearing Board claims to have based its Decision on.

26

86.    Following the Decision, Plaintiff learned that one of the Hearing Board members, Ashley Prinz, was a former intern with the District Attorney for the Suffolk County District Attorney's Office.  This critical fact was never disclosed to Plaintiff prior to the Hearing.  Ms. Prinz's experience with a prosecutor for the Suffolk County District Attorney's Office facilitated a hearing that was prosecutorial in nature.  Ms. Prinz's background constituted a conflict of interest against Plaintiff, as the accused student, and should have been disclosed and appropriately dealt with.

87.    On November 18, 2013, Plaintiff filed his Appeal of the Decision based on procedural errors committed during the investigation of Jane Doe's complaint by the Dean of Students Office and during the Hearing, and based on new evidence not readily available prior to the Hearing.

88.    Plaintiff stated many reasons as the basis for his Appeal, including, without limitation: (i) UMass's failure to conduct a full and fair conflict check among the Hearing Board members prior to the Hearing, including with respect to Ashley Prinz; (ii) UMass's failure to ensure that all Hearing Board members were thoroughly and properly trained to decide cases of sexual misconduct and the effects of alcohol; (iii) an incomplete audio recording of the Hearing; (iv) failure to engage in meaningful cross-examination of Jane Doe about the extent of her

intoxication and/or use of anti-depressant drugs (if at all);  (v) failure to accurately and fairly characterize statements made by the witnesses as to the details of the evening; and (vi) wrongful reliance upon testimony of Ms. Harrington, who was not a witness with personal knowledge of the events of the Evening of September 13.

89.    On December 4, 2013, UMass issued a short letter to Plaintiff denying the Appeal and upheld the Decision finding him responsible and his attendant sanction of expulsion.  UMass failed to provide any rationale or detail about why the Decision was upheld.

90.    UMass's policies effectuate a failure of due process for the student population, especially the male student population, in their current state because the policies are set up to encourage and facilitate the reporting of false reports of sexual misconduct and/or other grievances without any recourse for the falsely accused.

**VIII.  Plaintiff Makes Multiple Public Records Requests
To Obtain Relevant Information In Defense Of
The Allegations of Sexual Misconduct**

91.    Following Plaintiff's expulsion, he realized that there must be more relevant documents in existence than what was provided to him by UMass, including a Resident Assistant Incident Report, and reports from the University's Health Services, Center for Women & Community, and reports from the Resident Director and Residence Education Leadership (REL).

92.     In December 2013, realizing that UMass had not provided "all documents" related to his conduct case as he had requested on October 31, 2013 in preparation for the Hearing, the Plaintiff sought to obtain relevant information in defense of the allegations against him. Between December 2013 and May 2014, the Plaintiff made a total of five (5) formal public records requests to UMass for information the university had or received regarding the allegations against him pursuant to Massachusetts Public Records Act § 6-10, et seq. Plaintiff requested, *inter alia*, (i) the Incident Report, if any, by the Resident Assistant, Mike Petrillo, who was on duty the Evening of September 13, 2013; (ii) the Incident Report, if any, by the Resident Director, Ben Kisang, who was on duty on the Evening of September 13, 2013; (iii) the report, if any, by Residence Education Leadership (REL), Ryan Young, (iv) the report, if any, by the triage nurse who fielded Jane Doe's call; (v) the report, if any, from the Center for Women & Community staff who spoke to Jane Doe; and (vi) missing pages from emails between Dean Patricia Cardoso and Jane Doe's roommate Olivia Harrington and friend James Pires, which contained handwritten notes by Dean Cardoso.

93.     In response to Plaintiff's first public records request, UMass stated that all information contained in his student conduct file had previously been provided. However, UMass's response misses the point and did not preclude material

29

information that existed *outside* Plaintiff's student conduct file.  Plaintiff reiterated his public records request, indicating that the request was not specific to the contents of the student conduct file.  However, his follow up public records request and three other public records requests were not responded to by UMass.

94.    UMass's lack of responsiveness to Plaintiff's formal public records requests resulted in Plaintiff's appeal to the Massachusetts Secretary of State to obtain information he believed UMass possessed but had not provided to him regarding the conduct case against him.  For each and every public records request UMass ignored, the Plaintiff submitted an appeal to the Secretary of State.

95.    While UMass responded to the Plaintiff's public records requests, its responses, at times, claimed the Plaintiff's requests were "exempt from disclosure" on the basis of state law privacy statutes and/or required a fee for staff time to search for documents and for photocopies prior to UMass's disclosure of same.  While UMass is entitled to charge a fee under Massachusetts Public Records Act, records custodians are strongly urged to waive the fees in the interest of open government.  Notwithstanding such public policy, or the fact that Plaintiff was defending his student conduct case, UMass assessed the fees to Plaintiff prior to gathering and providing any documentation.

96.    UMass took nearly nine (9) months to respond to Plaintiff's many requests for "any and all" information pertaining to Plaintiff's student conduct case, including his public records requests, and in the end, UMass has still not provided all information.

97.    Upon information and belief, all public records requests were directed to Dean Patricia Cardoso.

### IX.    Plaintiff's Entire Future is Severely Damaged by Defendant UMass's Actions

98.    As a result of Defendant UMass's actions, Plaintiff's entire academic career is ruined and, without a college education, his overall economic future is completely compromised.

99.    Currently, Plaintiff's education has been severely compromised due to his expulsion from UMass.   Plaintiff's ability to secure admission to any colleges at a remotely equal caliber to that of UMass has also been severely compromised.

100.    Plaintiff's academic and disciplinary record is completely tarnished and will not withstand scrutiny by any transfer to another educational institution, including graduate studies.

101.    As a result of Defendant UMass's actions, the financial resources used to provide Plaintiff with a college education at UMass have been squandered.

102.   As a result of Defendant UMass's actions, Plaintiff has undergone psychological counseling on a regular basis.

103.   The stress of UMass's complete mishandling of Plaintiff's conduct case greatly exacerbated Plaintiff's asthma, significantly raised his blood pressure, and caused Plaintiff to suffer substantial weight gain.

104.   Without appropriate redress, the unfair outcome of the Hearing will continue to cause irreversible damages to Plaintiff, with no end in sight.  Plaintiff seeks redress from this Court to undo the wrongs occasioned by UMass on his education and future.

## AS AND FOR THE FIRST CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972

105.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

106.   Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

107.   Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic

programs are subject to Title IX of the Education Amendments of 1972, even though there is very little direct federal funding of school sports.

108.   Upon information and belief, Defendant UMass receives federal funding and grants.

109.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added).  Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[2]

110.   The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also *"accord[] due process to both parties involved..."*[3]

111.   The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

---

[2] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn.98-101.

[3] *Id.* at 22 (emphasis added).

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint..."[4]

112. A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults." [5]

113. Based on the foregoing, Defendant UMass has deprived Plaintiff, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of Defendant UMass's guidelines and regulations.

---

[4] *Id.* at 20.

[5] *Id.* at 21.

114. Based on the foregoing, UMass's own Title IX Coordinator had no knowledge of Plaintiff's student conduct case until _after_ the case was already decided by the Hearing Board.

115. Based on the foregoing, Defendant UMass failed to conduct any material investigation of the Evening of September 13, and conducted the subsequent Hearing in a manner that was biased against the male being accused.

116. Based on the foregoing, Jane Doe was supported by the university and escaped scrutiny for her own violations of the Code, while Plaintiff was forced to put together his own defense against all odds and was treated as "guilty until proven innocent".

117. Based on the foregoing, the Decision demonstrates bias against the male being accused insofar as Jane Doe's witnesses and memory recall were no more trustworthy than that of Plaintiff's, but the Hearing Board failed to credit Plaintiff in the same regard, and entirely discredited Plaintiff's memory recall and witnesses.

118. To find a student responsible for sexual misconduct, the Code requires the Hearing Board to find that the student forced the person to participate in a sexual act without consent or engaged in a sexual act with that person while she was incapable of understanding by reason of intoxication. UMass found Plaintiff

responsible of sexual misconduct. However, the evidence shows that Jane Doe followed Plaintiff around all evening, did not exhibit slurred speech or staggering, texted with her roommate to reserve their room to be alone with Plaintiff, and vulgarly directed Plaintiff to engage in sexual intercourse and to use a condom.

119. The Hearing Board was not impartial and was inadequately trained. The Hearing was conducted in a manner that was slanted against the male accused; Mr. Conway's line of questioning, tone, demeanor and overall behavior demonstrated his bias against Plaintiff. In stark contrast, Mr. Conway was supportive of Jane Doe and addressed her in a calm, soothing and reassuring manner throughout the Hearing. Plaintiff was questioned in a prosecutorial manner and constantly interrupted when he provided responses. Jane Doe, on the other hand, escaped meaningful questioning about her text messages reserving the room for herself and Plaintiff, and her overall incredible lack of memory of the evening.

120. Based on the foregoing, Defendant UMass imposed sanctions on Plaintiff that were disproportionate to the severity of the charges levied against him and without any consideration of his clean disciplinary record at UMass, and without providing an adequate written summary for the basis therefor.

121. Based on the foregoing, Defendant UMass's guidelines and regulations disproportionately affect the male student population of the UMass community as a

36

result of the higher incidence of female complainants of sexual misconduct against male complainants of sexual misconduct.

122.   Based on the foregoing, male respondents in sexual misconduct cases at UMass are discriminated against solely on the basis of sex.  They are invariably found guilty, regardless of the evidence, or lack thereof.

123.   Upon information and belief, UMass is currently under investigation by the U.S. Department of Education regarding its handling of sexual assault allegations.

124.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE SECOND CAUSE OF ACTION
### Breach of Contract

125.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

126.   Based on the aforementioned facts and circumstances, Defendant UMass breached express and/or implied agreement(s) with Plaintiff.

127.   UMass's blanket statement that "the provisions of the CSC are not to be regarded as a contract between the student and the University," does not amount

to a waiver of liability for what amounts to a clear breach of contract by UMass in this action.

128.   As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational opportunities, economic injuries and other direct and consequential damages.

129.   Plaintiff is entitled to recover damages for Defendant UMass's breach of the express and/or implied contractual obligations described above.

130.   As a direct and proximate result of the above conduct, actions and inactions, Plaintiff has suffered physical, psychological, emotional and reputational damages, economic injuries and the loss of educational opportunities.

131.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE THIRD CAUSE OF ACTION
### Covenant of Good Faith and Fair Dealing

132.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

133.   Based on the aforementioned facts and circumstances, Defendant UMass breached and violated a covenant of good faith and fair dealing implied in

the agreement(s) with Plaintiff by meting out a disproportionate sanction of expulsion against Plaintiff, notwithstanding the lack of evidence in support of Jane Doe's claim of sexual assault.

134.   As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational opportunities, economic injuries and other direct and consequential damages.

135.   Plaintiff is entitled to recover damages for Defendant UMass's breach of the express and/or implied contractual obligations described above.

136.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE FOURTH CAUSE OF ACTION
### Estoppel and Reliance

137.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

138.   Defendant UMass's various policies constitute representations and promises that Defendant UMass should have reasonably expected to induce action or forbearance by Plaintiff.

139.   Defendant UMass expected or should have expected Plaintiff to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Defendant UMass would not tolerate, and Plaintiff would not suffer, harassment by fellow students and would not deny Plaintiff his procedural rights should he be accused of a violation of Code.

140.   Plaintiff relied to his detriment on these express and implied promises and representations made by Defendant UMass.

141.   Based on the foregoing, Defendant UMass is liable to Plaintiff based on Estoppel.

142.   As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational opportunities, economic injuries and other direct and consequential damages.

143.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE FIFTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

144.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

145.   Based on the foregoing facts and circumstances, Defendant UMass intentionally and/or with willful or wanton indifference to the truth, engaged in conduct to expel Plaintiff from UMass without regard to the truth of the allegations being made by Jane Doe and without evidence in support of Jane Doe's shaky claims, and otherwise intentionally inflicted emotional distress upon Plaintiff.

146.   The above actions and inactions by Defendant UMass were so outrageous and utterly intolerable that they caused mental anguish and severe psychological and emotional distress to Plaintiff, as well as physical harm, financial loss, humiliation, loss of reputation and other damages.

147.   As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational, economic injuries and other direct and consequential damages.

148.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

41

## AS AND FOR THE SIXTH CAUSE OF ACTION
### Negligence

149.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

150.   Defendant UMass owed duties of care to Plaintiff.   Such duties included, without limitation, a duty of reasonable care in conducting an investigation of the allegations of rape and sexual misconduct against him.

151.   Defendant UMass breached its duties owed to Plaintiff.

152.   As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational opportunities, economic injuries and other direct and consequential damages.

153.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE SEVENTH CAUSE OF ACTION
### Declaratory Judgment

154.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

155.   Defendant UMass has committed numerous violations of the Parties' contracts and of federal and state law.

156.   Plaintiff's education and future career has been severely damaged. Without appropriate redress, the unfair outcome of the Hearing will continue to cause irreversible damages to Plaintiff's educational career and future employment prospects, with no end in sight.

157.   As a result of the foregoing, there exists a justiciable controversy between the Parties with respect to the outcome, permanency, and future handling of Plaintiff's formal student record at UMass.

158.   By reason of the foregoing, Plaintiff requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by UMass at Plaintiff's Hearing be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's expulsion from UMass be removed from his education file; (v) any record of Plaintiff's Hearing be permanently destroyed; and (vi) UMass's rules, regulations and guidelines are unconstitutional as applied.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendant UMass as follows:

(i)     on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)    on the second cause of action for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)   on the third cause of action for breach of the covenant of good faith and fair dealing, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    on the fourth cause of action for estoppel and reliance, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)     on the fifth cause of action for intentional infliction of emotional distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages

45

to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)    on the sixth cause of action for negligence, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)    on the seventh cause of action for a declaratory judgment pursuant to 28 U.S.C. § 2201, a judicial declaration that: (i) the outcome and findings made by UMass at Plaintiff's Hearing be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's expulsion from UMass be removed from his education file; (v) any record of Plaintiff's Hearing be permanently destroyed; and (vi) UMass's rules, regulations and guidelines are unconstitutional as applied; and

(viii)    awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

**Dated: New York, New York**
**August 6, 2014**

Respectfully submitted,

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff*

By: _____
**Andrew T. Miltenberg, Esq.**(*pro hac vice*
**pending)**

46

Kimberly C. Lau, Esq. (*pro hac vice*
pending)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
Tel: (212) 736-4500
klau@nmllplaw.com
amiltenberg@nmllplaw.com

-and-

local counsel for plaintiff,

Matthew T. McDonough Attorney At Law
Matthew T. McDonough, Esq.
482 Broadway
Somerville, MA 02145
BBO#:665857
Tel: (617) 702-4012
matthew@mcdonough-law.net

*Attorneys for Plaintiff John Doe*

## JURY DEMAND

John Doe herein demands a trial by jury of all triable issues in the present matter.

Dated: New York, New York
       August 6, 2014

Respectfully submitted,

NESENOFF & MILTENBERG, LLP
*Attorneys for Plaintiff*

By: _____
Andrew T. Miltenberg, Esq.(*pro hac vice*
pending)
Kimberly C. Lau, Esq. (*pro hac vice*
pending)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
klau@nmllplaw.com
amiltenberg@nmllplaw.com

-and-

local counsel for plaintiff,

/s/Matthew T. McDonough
Matthew T. McDonough
 482 Broadway
Somerville, MA
BBO#:665857
Tel: (617) 702-4012
matthew@mcdonough-law.net